LEMUEL NICHOLS *vs*. ALFRED BAKER.

Penobscot.    Opinion July 5, 1883.

*Promissory notes. Fraud. Evidence.*

Where a note is procured under the fraudulent pretense of selling merchandise, to be subsequently delivered, the person procuring the note not intending to deliver the property at all, but using the form of negotiation about it merely as an instrument of fraud, the note, as between the original parties, is void. It is also void in the hands of a third party who received it with a knowledge of its fraudulent procurement.

For the purpose of showing that such a note was fraudulent in its inception, that the design was not to deliver the property 'sold, it was held admissible in an action upon the note, to show that the party who procured it had substantially similar transactions about the same time with others, in which instances, the property was not delivered.

It was also held admissible to introduce the writings made in such other transactions to show by the comparison of handwriting, the identity of the individual engaged in the several transactions.

Dissenting opinion on the motion by APPLETON C. J., and BARROWS, J.

ON EXCEPTIONS, and motion to set aside the verdict.

Assumpsit on a promissory note of the defendant for one hundred and eighty dollars, dated June 7, 1879, payable in three months. The writ was dated September 9, 1879. The plea was the general issue. The verdict was for the defendant.

The facts sufficiently appear in the opinions.

*Humphrey and Appleton,* for the plaintiff.

The testimony of witness, Blagden, relating the circumstances of his giving a note to the same parties who procured the defendant's note, and that he hadn't received the pruning shears, was inadmissible because the jury could not limit its application.

Suppose these same men committed these two distinct crimes, we respectfully insist that it was not competent to prove the second for the purpose of proving or giving intensity to the first. In the language of MORTON, J., in a similar case, (*Jordan*

v. *Osgood*, 109 Mass. 461) "the effect of such proof may be to produce such a state of mind in the jury to whom it is addressed, that a less weight of testimony satisfies them than would otherwise be necessary to produce conviction. "

The wrong done an innocent plaintiff by the admitting of such testimony, cannot be better illustrated than by this very case. Suppose a single individual is defrauded into giving his note, and this note, before maturity, goes regularly into the hands of an innocent purchaser. In a suit between such purchaser and the defrauded maker, a jury would without difficulty decide, as the law decides, that the defrauded maker must pay the innocent purchaser. But when the case is no longer a single case, but is duplicated and multiplied, the feelings of sympathy and indignation on the part of jurors may very likely overbear considerations of duty and law.. See remarks of HOWE, J., in 13 Allen, 179.

But in this case Blagden was permitted to testify what two persons stated to him, with no proof whatever of identity except two signatures of different names, with no testimony whatever as to the identity or similarity of handwriting. We respectfully submit that this was an error. *Jordan* v. *Osgood*, 109 Mass. 457; *Thayer* v. *Thayer*, 101 Mass. 111; *Com.* v. *Elwell*, 1 Gray, 463; *Com.* v. *Blood*, 4 Gray, 31; *Blake* v. *Howard*, 11 Maine, 202; *Aldrich* v. *Warren*, 16 Maine, 465; *State* v. *Hastings*, 53 N. H. 452; Criminal Leading Cases, (False Pretences).

Counsel in an able argument further contended that the motion to set aside the verdict as being against law and the weight of evidence, should be sustained.

*Wilson and Woodward and Jasper Hutchings*, for the defendant, cited: *Rowley Bigelow*, 12 Pick. 307; *Wiggin* v. *Day*, 9 Gray, 97; *Cary* v. *Hotailing*, 1 Hill, 311; *Com.* v. *Stone*, 4 Met. 43; 1 Greenl. Ev. § 111; *State* v. *McAllister*, 24 Maine, 139; *Castle* v. *Bullard*, 23 How. 172; *State* v. *Potter*, 52 Vt. 33; *Mussey* v. *Mussey*, 68 Maine, 346; *Woodman* v. *Dana*, 52 Maine, 9; *Moody* v. *Rowell*, 17 Pick. 490; *Homer* v. *Wallis*, 11 Mass. 308.

SYMONDS, J.   One of the grounds of defence to this action on a promissory note alleged to have been signed by the defendant was, that if the signature was genuine — which was denied — it was procured by fraud, under the pretence of selling him some pruning shears to be subsequently delivered, or appointing him agent for the sale of them; — the men who obtained the note intending not to deliver the shears at all, but using the form of negotiation about them merely as an instrument of fraud, as a means by the aid of which they could the more readily accomplish their purpose of deceiving the defendant and getting his note by falsehood, without consideration and without knowledge even on his part of the character of the paper he was signing.

The court correctly ruled that if the evidence sustained this claim in defence, the note as between the original parties would be void.

Upon this issue, then, the question of the intent of the men with whom the defendant dealt became material.   The shears were never delivered, and no explanation was ever given.   Was this accidental, due to subsequent causes which might remove the charge of fraud, or was it a part of the original plan — none having been sent because there was no intention to send them?

Upon this question alone, and for the purpose of showing that the note was fraudulent in its inception, that the design was not to deliver the shears, the defendant offered testimony to prove that within a few days of the same time, the men who procured the note of the defendant had a substantially similar transaction with a resident of a neighboring town, and that in his case, too, the shears failed to arrive.   To the admission of this evidence, carefully limited at the time and in the charge to the force the judgment of the jury should attach to it in explanation of the non-delivery of the shears, to its effect to strengthen the probability that the failure to deliver them to the defendant was intentional, there being no explanation in either case and two such accidents not being so likely to occur as one, the exception of the plaintiff cannot be sustained.   It is clear upon principle

that when the question to be tried is whether the failure in one instance to deliver goods which had been promised and for which a note had been given was intentional and fraudulent, or not, the fact that about the same time under similar circumstances, notes were procured by the same men in other instances upon the same promise to deliver goods, and none arrived and no explanation was given, is proper for the consideration of the jury in determining what design was present in the particular transaction upon which they are to pass. The ruling at the trial, in terms, only received the fact of non-delivery in two similar instances as tending to show that in each, the intention to deliver was wanting. We think this was correct and also that the ruling may be supported on broader grounds. It is generally true that contemporaneous frauds may be proved when they tend to show a fraudulent intent in the particular transaction under investigation. In the numerous cases in which this question has been considered, there may be slight differences in result, not entire uniformity in deciding in what cases one fraud may properly be said to make manifest the intention which pervades another transaction; but the rule of evidence certainly goes to this extent, as stated in *Jordan* v. *Osgood,* 109 Mass. 461, that another act of fraud is admissible to prove the fraud charged, when there is evidence that the two are parts of one scheme of fraud, committed in pursuance of a common purpose. This rule seems sufficient to justify the admission of the testimony to which exception is taken.

The procurers of the notes were two strangers, who hired teams at the plaintiff's livery stable in Bangor, were engaged for six or seven weeks in driving about the country, and then went away. Evidence tending to show that they were employed during this time, in obtaining notes from different persons upon the promise to deliver pruning shears for them, that their business with others and their methods of doing it were substantially the same as with the defendant, close similarity in the ways in which they operated in the several instances, in the

representations and means by which they induced persons to sign, the number of notes which they obtained while driving over a limited territory during comparatively a short period — the plaintiff himself having purchased six of them, — their going away without delivering the shears according to their promise, the appearance of the notes in the hands of persons claiming to collect them as innocent holders ; — evidence tending to show these facts was admissible to prove a general plan to defraud, of which the jury might find the transaction with the defendant was a single instance. In the general features of the case, we think there was circumstantial evidence from which the jury were warranted in finding a common design in the two cases, the details of which were received before them ; — and evidence tending to show that such common design was a fraudulent one, was pertinent, whether it related to one case or the other, or to both. The evidence went far enough in this direction to authorize the admission of testimony that there were other instances in which the goods were not delivered according to the contract, as tending to prove a fraudulent purpose in this.

In connection with the circumstances of the case, pointing more or less directly to the conclusion that the men who obtained the notes were the same in the two cases, papers written by them were received in evidence to enable the jury to judge of their identity by comparison of hands. To this exception was taken.

In 1 Greenl. Ev. § 512, referring to the use of answers in chancery in evidence in subsequent proceedings, it is said, " some proof of the identity of the party will be requisite. This may be by proof of his handwriting. " At the trial of indictments for perjury in such answers, it was held in *Rex* v. *Morris*, 2 Burr. 1189, and in *Rex* v. *Benson*, 2 Camp. 508, that identity of the person might be shown by proof of handwriting. In an action against Henry Thomas Ryde, as the acceptor of a bill of exchange, it appeared that a person of that name had kept cash at the bank where the bill was payable, and had drawn checks which the cashier had paid. The cashier knew the person's handwriting by the checks and testified that

the acceptance was in the same handwriting; but he had not paid any check for some time and did not personally know him. There was no other proof of his identity with the defendant, and this was held *prima facie* sufficient. "It cannot be said there was not some evidence of identity. A man of the defendant's name had kept money at the branch bank; and this acceptance is proved to be his writing." *Roden* v. *Ryde*, 4 Ad. & El. N. S. 626. Where other writings, admitted to be genuine, are in the case "the comparison may be made by the jury with or without the aid of experts." 1 Greenl. Ev. § 578. The rule of practice in this state allows papers not otherwise pertinent, to be proved and offered in evidence for the single purpose of enabling the jury to judge by comparison of hands of the genuineness of signatures; that is, whether they were or were not written by the same hand. *Chandler* v. *LeBarron*, 45 Maine, 534. If they may judge of handwriting for the purpose of determining the genuineness of a disputed signature, they may just as well decide whether two hands are the same for the purpose of determining the identity of parties. The process is the same, and the thing to be decided is the same. Only the object of the inquiry differs. Proof of the genuineness of two signatures in the same hand is proof of the identity of the writer of the two. One reason now given for excluding the opinions of non-experts who are not acquainted with the handwriting, is that the jury are as competent as they to make the comparison. The papers written by these men at the two times, were proper evidence for the examination of the jury on the question of identity.

The jury might well find upon the evidence, that the note was procured from the defendant by fraud, and that it was void between the original parties.

It was also for them to decide under proper instructions, whether the plaintiff was a *bona fide* holder for valuable consideration before maturity and therefore entitled to recover the amount of the note, if genuine, notwithstanding the fraud; and also the other controverted question whether the facts of the case proved the note to be in law a forgery, void in the hands

·even of an innocent holder.  Our opinion is that, there having been no error in the rulings on these points, the verdict is not so clearly against the weight of evidence as to require the granting of a new trial.

*Motion and exceptions overruled.*

VIRGIN, PETERS and LIBBEY, JJ., concurred.

WALTON and DANFORTH, JJ., concurred in the result.


DISSENTING OPINION BY

APPLETON, C. J.   This is an action of assumpsit upon a note ·of the following tenor :

$180.                        Orrington, January 7, 1879.

Three months after date, I promise to pay H. T. Jepson & Co. or bearer, one hundred and eighty dollars at the Farmer's National Bank, Bangor, Maine, value received.

(Signed)                        Alfred Baker."

The plaintiff is a stable keeper in Bangor.  He testified that he purchased the note in suit and others before their maturity, paying the full value therefor, and ignorant of any facts that would tend in the slightest degree to impeach their validity, that the persons of whom he purchased, — introduced themselves as having occasion to hire teams,—stating that they had been recommended by a friend of his to apply to him—that he fixed a price per day, that they hired his teams paying promptly for their use — that after paying seventy-five or a hundred dollars — they proposed purchasing horses and harnesses as cheaper than hiring and paying for the same in notes, (one of which is the one in suit), that he objected, but upon their assertion that they were good and would be met at maturity, he employed an attorney to examine the registry of deeds to see if the signers owned real estate and finding they did, he made a trade, by which he obtained the note in suit and others, for the property sold them, that he did not know their business, but supposed they were runners, and that he neither knew nor had suspicion of any fraud in the procuring of the notes, or for what they were given.

The note was given on time. The plaintiff purchased it shortly after it was given. He gave full consideration for the same. The fact of full consideration is the surest guaranty of good faith. He knew nothing of the circumstances under which the note was given. He had no suspicions of its fraudulent origin. He was under no legal nor moral obligation to enquire as to the origin of the note. The signer had announced to the public that it was for "value received." He knew the parties with whom he traded as customers and traded with them as such. All this is uncontradicted.

[No principle of law should be more carefully guarded or more sacredly adhered to than that the *bona fide* holder of a note purchasing it for its value before maturity, should be protected against the sympathy a jury may have for the folly or their indignation against the fraud by which a note may have been dishonestly obtained.] The *bona fide* purchaser is ignorant of the folly. He is no party to the fraud. The foolish and the deceived must bear the consequences of their folly and imbecility and not impose on those who relied on their assertions, the penalty which nature always attaches to negligence or want of caution.

The law as to the rights of a *bona fide* endorsee of a note before maturity and for value, is settled by a rare and unequalled uniformity of decisions in every State of the Union. "Possession of such an instrument payable to bearer, is *prima facie* evidence that the holder is the proper owner and lawful possessor of the same ; and nothing," observes CLIFFORD, J., in *Collins* v. *Gilbert*, 94 U. S. 753, "short of fraud, not even *gross negligence*, if unattended with *mala fides*, is sufficient to overcome the effect of that evidence or to invalidate the title of the holder supported by that presumption." Such after a full examination of the authorities bearing upon the question has been held to be the law in this State. *Farrell* v. *Lovett*, 68 Maine, 326 ; *Kellogg* v. *Curtis*, 65 Maine, 59 ; *Swift* v. *Smith*, 102 U. S. 442. "The other rule laid down in some of the cases, that an endorsee for value cannot recover if he takes the note without due caution, or under circumstances which ought to excite the suspicions of a prudent

man," observes MORTON, J., in *Smith* v. *Livingston*, 111 Mass. 345, "is indefinite and uncertain." The rule established is in accordance with the general principles of commerce and best adapted to protect the free circulation of negotiable paper. *Re Great Western Tel. Co.* 5 Biss, 363 ; *Morehead* v. *Gilmore*, 77 Penn. 118.

The plaintiff is to be protected. He had no suspicion or knowledge of the fraud. He bought before maturity. He paid full value.

The defendant interposes three grounds of defence : The first is that it is a forgery.

It is only necessary to examine the signatures to see at a glance that the defendant's signature to the note is genuine. It is safe to say that no intelligent man can have an honest doubt on the subject.

The next ground is that "if the signature was his it was made by him with the intent to sign another and entirely different instrument, and that no negligence was to be imputed to him, he not knowing what he signed."

The defendant's signature is on two papers in the case. The first was a statement of his real estate and his stock. This he testifies he read carefully, — "was very careful about it, " (the reading,) and knows he understood it. It was in these words :

"Orrington, June 7, 1879.

"This certifies that I, Alfred Baker, have examined the Sisson Improved Pruning Shears, and do consider them a practical implement, and have purchased of H. T. Jepson & Co. forty-five pieces at four dollars each, and *have given my written obligation in the amount of $180, which is negotiable and payable at the Farmer's National Bank*, of Bangor, Maine," &c.

(Signed)                                Alfred Baker."

In the agreement entered into between him and "the manufacturers of the Sisson pruning shears, " which was delivered him, there is the recital of his having "given his written obligation in the sum of $180. "

Both these papers he carefully read and understood. He swears he was very particular as to his reading them. After

reading them with care, he signed a paper reciting that he had given his "written obligation in the amount of $180, which is negotiable and payable at the Farmer's National Bank, Bangor, Maine," — and that he received an appointment of his agency, which he produced containing a statement of the same fact.  After a careful perusal of these papers he knowingly and understandingly testifies to these facts.  What is such an obligation but a note of hand?  There is his written statement — that he had done this and his oath that he read the paper and understandingly signed it.

This paper he placed in the hands of the men with whom he was contracting.  It gave assurance of his ability to pay.  It was given to be used.  It was used.  Upon the credit of the facts therein stated, and in the belief of their truth, the plaintiff made his purchase.  If ever the doctrine of estoppel is to be applied, it is in a case like the present.  If one of two must suffer, it certainly should not be the plaintiff, whose only fault is in believing the defendant's statements to be true.

If it be said that the defendant did not understand the meaning of the word "obligation," the plaintiff should not suffer for such gross ignorance.  He did know that he signed a paper obliging him to pay a sum of money — which was negotiable and payable at a bank.

No one can reasonably doubt that the defendant signed the note in question, and knew what he was signing.  If he did not, the plaintiff should not suffer for such inconceivable negligence and stupidity.  He should not seek to throw the burden upon one who without fault relied upon his written assertions.  He would be barred by his assertions as to property.  He is equally so as to ownership.

The defendant is estopped by his representations.  He notified to the world that he had signed a negotiable contract.  He stated the date and amount, when and where payable.  He stated the means he had with which he could pay it.  He promised to pay to whomsoever it should be endorsed.

If he had written a letter to the plaintiff containing the facts set forth in his certificate, and the plaintiff had in good faith, purchased the note, relying on them, he would be estopped to defend

against the same. He did more. He wrote a general letter to the whole community reciting what he had done, and that he had means with which to meet his note at maturity. The plaintiff in good faith, relying upon the truthfulness of his representations, purchased. The defendant may have been deceived in making those representations, and thus be a loser. The plaintiff who relied upon them should not be. Such is well settled law.

To create an estoppel *in pais* the representation relied upon, must have induced the party seeking to enforce an estoppel, to do what resulted to his detriment, and what he would not otherwise have done. *Allum* v. *Perry*, 68 Maine, 233. "In all cases where one party has been induced to take a particular course in the faith of statements made or expectations held out either expressly or by implication, by another, the latter will be debarred from pursuing any subsequent mode of action at variance with his former language and conduct, to the injury of the former." 2 Hare & Wallace, Leading Cases, 165.

There is no dispute as to the above facts. It is a clear case of negligence. In *Kellogg* v. *Curtis*, 65 Maine, 590, the judge, on facts similar to the case at bar, decided that the defendant was defrauded and guilty of negligence in signing the note in question. "What constitutes negligence in a case like this," observes PETERS, J., "when the facts are clear and unequivocal, is a question of law." "The principle is clearly and correctly enunciated in a late case in Missouri not yet reported, thus: 'When it appears that the party to be charged intended to bind himself by some obligation, and voluntarily signed his name to what he supposed to be the obligation he intended to execute, having full and unrestricted means of ascertaining the true character of such instrument before signing it, but neglected to avail himself of such means of information and relying on the representations of another as to the contents of the instrument, signed and delivered a negotiable promissory note, instead of the instrument he intended to sign, he cannot be heard to impeach its validity in the hands of a *bona fide* holder.'" To the same effect is the case of *Abbott* v. *Rose*, 62 Maine, 194. One who allowed his name to be signed to a promissory note, supposing

his signature was being attached to the acceptance of an agency, is liable to a *bona fide* indorsee. *Indiana Bank* v. *Weckerly*, 67 Ind. 345, and *Maxwell* v. *Morehart*, 66 Ind. 301. Here there is no allegation or pretence of the substitution of one paper for another as the defendant testifies he signed a paper making him liable, and if he failed to appreciate its effect, the loss should be his and not another's.

The last ground of defence is that when the note was given, the payees or their agents had no intention of delivering the articles contracted to be delivered — and therefore that the note was without consideration and fraudulent in its inception. That may be conceded but it furnishes no defence against a *bona fide* holder. Such is the universal rule.

To sustain this branch of the case the evidence of one Bragdon was received as to his subsequent dealing with two persons who were not identified as those dealing with the defendant. Their identity should have been first shown. This was not done. The statements and the conversation with them — *res inter alios* — were admitted and the jury were permitted without proof to infer identity. *Com.* v. *Jackson*, 132 Mass. 16. The conversations of Bragdon with these strangers was hearsay, inadmissible and offered to prejudice the jury. But this illegal testimony was admitted to affect the rights of a *bona fide* holder. It was admitted to prove identity — the question in dispute. Though evidence legally inadmissible, it had the same effect as if admissible. The jury were allowed to give the same effect to and to draw the same inferences from illegal testimony as from legal.

These strangers had not been witnesses — therefore the evidence was not admissible to contradict what they might have said on the stand. It is a bald case of hearsay.

The verdict was the result of sympathy for the defendant. But he has little claim to sympathy. He entered into a contract by which he expected great profits from his neighbors. He seeks to escape from his " obligation " by the denial under oath of his signature. He may have been the victim of knaves. But that is no reason why the plaintiff should become the victim of his folly or his falsehood. Men had better bear the consequences

of negligence than seek to escape them by perjury.    Cheating is criminal but there are greater and graver crimes.

I think a new trial should be granted.

BARROWS, J., concurred.